United States Court of Appeals,

Eleventh Circuit.

No. 96-4525.

UNITED STATES of America, Plaintiff-Appellee,

v.

Freddy PAREDES, David Arias, Defendants-Appellants.

April 22, 1998.

Appeals from the United States District Court for the Southern District of Florida. (No. 95-551-CR-MOORE, K. Michael Moore, Judge.

Before EDMONDSON, Circuit Judge, and CLARK and WELLFORD[*], Senior Circuit Judges.

WELLFORD, Senior Circuit Judge:

Defendants David Arias and Freddy Paredes robbed two local convenience stores in Miami during the early morning of February 13, 1995, after stealing cars to carry out the crimes. Defendants obtained a case of beer, a carton of cigarettes, and under $170 in cash in the thefts. After an investigation, Paredes was summoned to the police station where he confessed to his role in the crimes. Thereafter, the police summoned Arias and requested a statement from him. Because he would not cooperate, a police officer told him that Paredes had already "told them everything." Confronted with that information, Arias also made a confession. The men were indicted under the Hobbs Act and with charges for use of firearms with respect to the two store robberies. The defendants moved to dismiss the indictment, claiming that there was an insufficient nexus with interstate commerce to sustain a conviction under the Hobbs Act. The district court denied the motion to dismiss defendants' motion, Arias' motion to suppress his confession as involuntary, and

_____

[*]Honorable Harry W. Wellford, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

Paredes' motion challenging the validity of his arrest. The jury found both guilty as charged, and the defendants now appeal their convictions and their very substantial sentences. We now affirm.

On February 13, 1995, at approximately 2:00 a.m., defendants stole a Grand Prix and, while wearing stocking masks, robbed a Farm Stores drive-through convenience market at gunpoint. They stole a case of beer, a carton of cigarettes, and a small amount of cash, and escaped in the stolen Grand Prix. The defendants then drove to a nearby McDonalds where they had previously parked a Camaro, which they had taken without the consent of the owner, Juana Arias.[1] They transferred the stolen loot to the Camaro and abandoned the Grand Prix in a nearby area. Not long after, in the early morning hours, they robbed a Fast Track drive-through convenience store, again at gunpoint and with stocking masks, and escaped in another stolen car. They took only a small amount of cash from the Fast Track store.

Miami Police Officer Nathaniel Fudge heard an alert to "be on the look out" for the robbers and the car used in the second robbery. Soon thereafter, he saw a car fitting the description of the second stolen car at the McDonalds where the Camaro car was parked. Unknown persons in that car spotted Fudge and they immediately began to drive away. When Fudge attempted to follow the car, it picked up speed and eluded Fudge. The officer sent messages to his dispatcher as the chase occurred. Fudge saw the persons in the car throw objects from the vehicle, and Arias later confessed that he and Paredes threw the goods out of the car because it's "better if they catch you with nothing in the car." Fudge lost the car, but other officers later found it abandoned and empty. Fudge then retraced his route and found lottery tickets and a dispenser not far from the McDonalds. It was later determined that Paredes' fingerprint was on the ticket dispenser.

---

[1]Juana Arias was Paredes' girlfriend and is David Arias' sister.

Meanwhile, Miami Police Officer Tamayo, who had heard about the robberies and reports of a car chase, saw the defendants walking near the area where the second stolen car had been abandoned, and questioned them. He let them go, however, for lack of any probable cause to detain them. Tamayo later looked for and found the two men again and took them to Arias' house.

Meanwhile, another officer found the Camaro at McDonalds, looked inside, and saw beer, cigarettes, and food stamps. He then staked out the car to see if anyone returned to it. He reported the VIN owner-identification number of the car and reported it to the station.

Miami police detective Alfredo Alvarez discovered that the car belonged to Juana Arias. He questioned Juana regarding her knowledge of the whereabouts of her car. When she stated that she believed that it was in her driveway, Alvarez informed her that it was elsewhere and that it contained stolen property. She then "blurted out" that her boyfriend must have stolen it. By that time, Tamayo had picked up Paredes and Arias and had brought them to the house.

The police took Paredes to the police station for questioning. At the station, officer Alvarez advised Paredes of his *Miranda* rights; Paredes executed a *Miranda* rights form and gave a taped confession that he and Arias had robbed the Farm Stores and the Fast Track convenience store. Paredes confessed that he had used two guns, but stated that they were not any good and that he only intended to "scare" his victims. He also admitted stealing the two cars and what had been obtained from the robberies.

Alvarez then caused Arias to be brought to the station for investigation and questioning. He told Arias that Paredes had already confessed and "told them everything." Arias, however, refused to give a statement until Paredes told him "to his face" that he had confessed to the police, and then Arias admitted that he had participated in the robberies. Officer Alvarez advised Arias of his

3

*Miranda* rights in English, which was Arias' stated language of preference. Alvarez did not read from a waiver form, but he explained the *Miranda* rights. Arias testified that he had read his rights from the form, that he understood his rights, and that he had initialed the form indicating that he understood what he read. He then gave a tape-recorded statement, confessing to robberies described above, and also stated that he chose which cars to steal.

The defendants were charged in a seven-count indictment with (1) conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951(a) and (2) **(count I)**; (2) twice affecting commerce by robbery in violation of the Hobbs Act **(counts II and IV)**; (3) using and carrying a firearm in connection with the robberies in violation of 18 U.S.C. § 924(c) **(counts III and V)**; and with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) **(counts VI (Arias) and VII (Paredes))**.

Arias moved to dismiss the indictment based on an insufficient interstate commerce connection to justify the Hobbs Act offenses. Magistrate Judge Turnoff issued a report and recommendation that the motion be denied. Arias also filed a motion to suppress the statements he had made in confessing to his role in the two robberies. The magistrate judge held an evidentiary hearing on the matter, and later entered a report and recommendation that the motion be denied. After a hearing at the beginning of the trial, the district court denied the motion to suppress. Paredes' motion challenging the validity of his arrest was also overruled.

At trial, three witnesses testified on the interstate commerce connection. Jose Vallencillo, a supervisor for Farm Stores, testified that Farm Stores sells merchandise made outside of Florida, including beer from foreign countries. Richard Dwayne Rentz, a co-owner of Fast Track, testified that Fast Track also sells merchandise from outside of Florida, such as cigarettes, beer, and nuts.

4

Special Agent Greene testified that a gun believed to have been used in the robberies had been manufactured in California. No one was injured in the store robberies.

After guilty verdicts, both defendants moved for judgments of acquittal, which were denied. Arias also renewed his motion to dismiss the indictment on lack of substantial interstate commerce involvement, which was denied. During trial, Paredes moved to sever his trial from that of Arias based on antagonistic defenses. The district court also denied those motions. Arias was sentenced to a total of 408 months in prison, and Paredes was sentenced to a total of 378 months.[2] The defendants were also ordered to pay $169.43 in restitution. The defendants now appeal, raising a number of alleged errors.

### I. *ARIAS*

Defendant Arias makes the following arguments on appeal:

A. The district court erred in denying his motion to dismiss the indictment because (1) the Hobbs Act is unconstitutional on its face because it requires less than a "substantial effect" on interstate commerce, or alternatively because (2) the required effect on interstate commerce was not shown in this case.

B. The district court erred in denying his motion to suppress the confession, because Arias was unable to understand the meaning and consequences of waiving his *Miranda* rights in light of the fact that Arias is mentally retarded and the police used inherently coercive tactics in persuading him to give a statement.

C. The district court erred in "double counting" by enhancing his offense level by 4 points for being a convicted felon in possession with a firearm and also giving him a separate sentence for possessing the same firearm.

Each party has adopted the brief of the other if it pertains to defenses common to both.

A. *Hobbs Act*

---

[2]Surely this was a near record for what might be deemed petty thefts, except for the involvement of handguns.

Arias argues that the Hobbs Act is unconstitutional because it confers federal jurisdiction on activities that have less than a substantial effect on interstate commerce. The Hobbs Act, however, purports to punish conduct of a person who "*in any way or degree* obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion." 18 U.S.C. § 1951(a) (emphasis added). Arias argues that *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), determined that proscribed conduct that is purely intrastate in nature must have a "substantial," not merely minimal, effect on interstate commerce. Alternatively, he argues, even if the court were to determine that a *de minimis* effect on interstate commerce were sufficient, that standard could not be met in this case because there was insufficient proof at trial that there was the required effect on interstate commerce, given the virtually undisputed evidence.

This court has previously determined that *Lopez* did not alter the measure of evidence necessary to support the interstate commerce element of a Hobbs Act prosecution; therefore, we are not writing on a clean slate. In *United States v. Castleberry,* 116 F.3d 1384 (11th Cir.1997), the defendant was charged under the Hobbs Act for receiving money by "fixing" DUI charges and preventing them from being prosecuted. The defendant argued that, pursuant to *Lopez,* the government was required to show that his activity had a "substantial affect" on interstate commerce, instead of only a minimal affect required under pre-*Lopez* jurisprudence. *Castleberry* held that the jurisdictional element of the Hobbs Act defeated the defendant's *Lopez* challenge, and that the pre-*Lopez* "*de minimis*" standard remained unchanged. The Court noted that it was joining all other courts that have addressed the issue since *Lopez,* that the government still need only show a minimal effect on interstate commerce to support a conviction under the Hobbs Act. *See Castleberry,* 116 F.3d at 1387 (citing *United States v. Atcheson,* 94 F.3d 1237, 1242 (9th Cir.1996); *United States*

6

*v. Bolton,* 68 F.3d 396, 399 (10th Cir.1995); *United States v. Stillo,* 57 F.3d 553, 558 n. 2 (7th Cir.), *cert. denied,* 516 U.S. 1137, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996); *United States v. Farmer,* 73 F.3d 836, 843 (8th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 2570, 135 L.Ed.2d 1086 (1996)).

The Fifth Circuit has also addressed the question and has explained its position that if the Hobbs Act charge is based on purely local activity, the government need not prove that the *individual* defendant's conduct substantially affected commerce; rather, it suffices that the government show a slight effect in each case, provided that the general conduct *in the aggregate* is of the general type which affects commerce substantially. *United States v. Robinson,* 119 F.3d 1205 (5th Cir.1997). This latter approach would be of little assistance to defendants.

Accordingly, we look to determine whether the government's evidence was sufficient to establish that the defendants' activities had a minimal effect on interstate commerce in this case. In doing so, we must review the evidence in a light most favorable to the government, giving it the benefit of all reasonable inferences. *Castleberry,* 116 F.3d at 1387-88.

The government's proof did show that the Farm Stores and the Fast Track both sell, to some degree, merchandise that had been manufactured or produced outside of Florida. Also, the gun that was believed to have been used in the robbery was manufactured in California.[3] In *United States v. Farmer,* 73 F.3d 836 (8th Cir.1996), the defendant robbed a local Hy-Vee Store in Iowa and planned to rob another one before he was caught. Farmer was prosecuted under the Hobbs Act, but the opinion does not specify the items stolen. The defendant was ordered to make restitution of $10,000, however, indicating that the robbery was more substantial than the ones involved herein.

---

[3]We acknowledge that cash may "travel" in interstate commerce but doubt any showing about this particular money. We do not rest our decision on this weak reed.

The defendant argued that his activities were not violative under the Hobbs Act, because "his offense was only a garden-variety, single local robbery, not the kind of thing Congress intended to reach in the Hobbs Act." *Id.* at 843. The Eighth Circuit disagreed, stating:

> We have no doubt that Congress, when it passed the Hobbs Act, had in mind primarily offenses with a broad impact on interstate commerce, as opposed to local robberies normally prosecuted under state law. The important point, though, is not what motivated Congress to pass the Hobbs Act, but rather what the Hobbs Act says. Its words in no way exclude prosecutions for single local robberies, so long as they satisfy the requirement that commerce or the movement of any article or commodity in commerce is obstructed, delayed, or affected....

*Id.*

In determining that the robbery in that case did, in fact, satisfy the requirement that commerce was affected, the court found that although the Hy-Vee main warehouse was located in Iowa, Hy-Vee sells products that come from all 50 states and different countries throughout the world, with seventy percent coming from outside of Iowa. Also, the court noted the Hy-Vee owned 162 food stores, 38 convenience stores, and 20 drug stores in seven states. The court stated, as a matter of law, that "[e]vidence about the business operations of Hy-Vee, whether in Waterloo or Des Moines, is relevant to show the effect on commerce of an interference with business at the Waterloo store." *Id.* The evidence in *Farmer,* in short, was much more convincing than the evidence in this case.

In contrast, the robberies in the instant case were made from two local convenient stores that are not connected to out-of-state stores. These stores in Miami are located hundreds of miles from the nearest other state. In addition, while the evidence showed that *some* merchandise was manufactured out of state, there is no evidence that *most* of the merchandise, or even a substantial part, is from outside of Florida. If we were reaching a decision apart from *Castleberry,* the small

8

amount of "interstate" property involved might have influenced us. We agree with the sentiments in *Farmer* that the Hobbs Act was intended to address "offenses with a broad impact on interstate commerce, as opposed to local robberies normally prosecuted under state law," especially petty robberies or extortions. *Lopez* also stated that

> [T]he scope of the interstate commerce power "must be considered in light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez,* 514 U.S. at 557, 115 S.Ct. at 1628-29 (quoting *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)).

Despite our reservations about these distinctions between the facts in the instant case and those in other post-*Lopez* decisions upholding the "in any way or degree ... affects commerce" language in the Hobbs Act, we are constrained by *Castleberry* to overrule this commerce clause contention. There was a proven "minimal effect on interstate commerce to support a conviction," *id.* at 1387, and these robberies involved felons who used firearms.

**B.** *The Confession:*

Arias contends that the district court erred in denying his motion to suppress the confession, because Arias was unable to understand the meaning and consequences of waiving his *Miranda* rights in light of the fact that Arias is mentally retarded and the police used inherently coercive tactics in persuading him to give a statement.

The government produced a board certified psychologist, Dr. Bonner, who examined Arias, heard the tape of his confession, and concluded that Arias had the mental capacity to waive his rights in a knowing, voluntary manner. Dr. Bonner suspected that Arias was intentionally doing poorly on his evaluations, so he administered another objective test which proved that Arias was, indeed,

9

malingering. While that evidence was countered by a defense witness, Dr. Marina, who determined that Arias could not understand his rights, the district court had the power and responsibility to weigh the testimony of Dr. Bonner over that of Dr. Marina. We find no merit to Arias' argument regarding the suppression of his confession.

In any event, even if we found error in this regard, any such error would have been harmless, given other facts in this case. Paredes gave a valid confession implicating Arias in the robberies. Paredes did not indicate that he associated with anyone else on the night of the robberies. In addition to Paredes' confession, the circumstances showed that Arias was with Paredes on that night, the police had found them walking around together in the area and about the time the robberies occurred, and they returned with the car to the house they shared with Arias' sister. Arias also fit the description of the taller, skinnier robber described by victims.[4]

C. *Sentencing of Arias:*

For sentencing purposes, the district court grouped the robbery convictions with the § 922(g)(1) felon-in-possession conviction pursuant to U.S.S.G. § 3D1.2 because the crimes involved "substantially the same harm." Although the robbery and the § 922(g) convictions carried base offense levels of 20, the district court used the § 922(g) conviction as the basis for assessing Arias' final offense level because upward adjustments made that conviction the most serious of the counts comprising the group. *See* U.S.S.G. § 3D1.3(a). Thus, the robbery convictions were not used as the basis of Arias' punishment.

---

[4]Although the robbers wore stocking masks, the victims described the perpetrators as a short, stocky robber and a tall, skinny robber.

Pursuant to the guidelines applicable to a § 922(g) conviction (*see* U.S.S.G. § 2K2.1), Arias' base offense level of 20 was increased by two levels because the firearm he used in the robbery or robberies had a serial number which was obliterated. U.S.S.G. § 2K2.1(b)(4). That offense level was also increased by four levels pursuant to U.S.S.G. § 2K2.1(b)(5) which requires such an increase "[i]f the defendant used or possessed any firearm ... in connection with another felony offense."[5] Arias was also sentenced to the mandatory 60- and 240-month sentences for his two convictions for using or carrying a firearm under 924(c).

Arias argues that enhancing his sentence four levels under U.S.S.G. § 2K2.1(b)(5) is expressly barred by the Sentencing Guidelines. Specifically, Arias cites U.S.S.G. § 2K2.4, which provides that the term of imprisonment for a 924(c) conviction is the sentence that is required by statute. The commentary to that guideline provides:

> Where a sentence under this section is imposed in conjunction with a sentence for an *underlying offense,* any specific offense characteristic for the possession, use, or discharge of an explosive or firearm (*e.g.,* § 2B3.1(b)(2)(A)-(F) (Robbery)) is not to be applied in respect to the guideline for the *underlying offense.*

U.S.S.G. § 2K2.4, comment., applic. note 2 (emphasis added). Arias argues that, due to the grouping of the § 922(g) conviction with the robbery convictions, the § 922(g) conviction should be deemed to be the "underlying offense" for purposes of this provision, and that, therefore, the four-level enhancement under § 2K2.1(b)(5) cannot be applied in this case. *See United States v. Vincent,* 20 F.3d 229, 240-241 (6th Cir.1994) (holding that possession by an unlawful user conviction under § 922(g)(3) served as an "underlying offense," and application of four-level enhancement under U.S.S.G. 2K2.1(b)(5) constituted double counting). We disagree.

---

[5]In this case, "another felony offense" refers to the robbery convictions.

We find persuasive the government's position that the "underlying offense" for purposes of U.S.S.G. § 2K2.4, comment., application note 2, is the "crime of violence" or "drug trafficking offense" that serves as the basis for the § 924(c) conviction.[6] *See United States v. Sanders,* 982 F.2d 4, 7 (1st Cir.1992) (holding that the predicate drug trafficking offense involved in the § 924(c) conviction is the "underlying offense" for purposes of application note 2 to § 2K2.4, and that the application note did not apply where the defendant was not sentenced pursuant to that offense). The grouping of the robbery and the § 922(g) offenses for purposes of sentencing does not change our conclusion. Rather, we agree with the reasoning of the Seventh Circuit, which held in a similar circumstance that "the grouping process does not call for redetermination of the offense level applicable to each crime. Thus, the "underlying offense' must be the crime during which, by using the gun, the defendant violated § 924(c)." *United States v. Mrazek,* 998 F.2d 453, 455 (7th Cir.1993).

Accordingly, we find no error in the imposition of the unquestionably severe sentence imposed on Arias. We are not unsympathetic to his plight—408 months for one-half of about $170 realized from the robberies! Arias was required, under the applicable statutes, to serve five years for one firearm offense followed by a twenty year term for another offense, based on his past felony record. In summary, there was no error in sentencing Arias under the Guidelines.

## II. *PAREDES*

Paredes makes two arguments in his brief:

A. *ERRORS IN JURY INSTRUCTIONS:*

---

[6]Title 18 U.S.C. § 924(c)(1) punishes one who uses or carries a firearm "during and in relation to any "crime of violence' or "drug trafficking crime.' "

1. The district court erred in instructing the jury on the essential elements of the crime, particularly because the court included language regarding "extortion," a crime which the government did not allege in the indictment.

2. The district court erred in refusing to sever the trials of Paredes and Arias, because Arias' defense was mistaken identity.

In *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Supreme Court held that the defendant seeking a reversal for plain error must establish (1) an error, (2) which was plain, and (3) that affected "substantial rights." Even if we determine that these requirements are met, we are left with *discretion* to correct the error, and generally decline to do so unless it seriously affects the defendant's right to a fair and impartial trial. *United States v. Elgersma,* 929 F.2d 1538, 1549 (11th Cir.1991)

In this case, the district court gave instructions which included the word "extortion," not "robbery," with respect to certain counts of the indictment. No one objected, or apparently even noticed this inadvertent error. Now, the defendants complain that the error was so profound that we should reverse the Hobbs Act jury verdicts. We first consider in this regard the prejudice to the defendants. Paredes complains that he and Arias were convicted of a crime not charged or mentioned in the indictment—extortion. No evidence of extortion was argued or presented at trial, because the evidence concerned the two robberies. This not a case in which the government sought constructively to amend the indictment, and we will not reverse the Hobbs Act convictions on this ground. "Extortion," of course, is a different offense, although violence, or threat of violence, is frequently a part of both robbery and the offense of extorting.

As pointed out by the government, there was not error with respect to mistaken use of the word, "extortion," rather than "robbery" in the Hobbs Act conspiracy charge, the agreement to join together to commit the robberies. Rather, the error occurred with respect to the substantive Hobbs

Act offenses. This error, however, was not plain error or reversible error, because we are not persuaded that it seriously affected "the fairness, integrity and public reputation of the proceedings." *See Elgersma,* 929 F.2d at 1549. There was no manifest injustice involved. *See Autrey v. United States,* 889 F.2d 973 (1989). Accordingly, after examining this issue carefully, we conclude that reversible error did not occur with regard to the jury instructions. *See United States v. Range,* 94 F.3d 614 (11th Cir.1996).

B. *Severance:*

Arguing that because Arias claimed mistaken identity, Paredes argues that the district court erred in refusing to sever the trials because Arias relied on a theory that Paredes committed both robberies, but that another individual was with him. Counsel for Arias argued that Paredes told him all about the robberies, and that this knowledge somehow led to his own self-incriminating statement. Paredes argues that failing to sever the trials upon his request was an abuse of discretion, even though persons who are indicted jointly are usually tried together, particularly in conspiracy cases. He argues that severance is compelled where defendants' defenses are antagonistic and mutually exclusive, citing *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. Unit B 1981).

We are persuaded, however, that the different theories of the case advanced by these defendants did not affect the fairness of the trial in light of the fact that the jury heard two confessions from these men that consistently stated that they committed the crimes in concert. We cannot find that the district court abused its discretion in deciding not to sever the trials. *Zafiro v. United States,* 506 U.S. 534, 540-41, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993); *United States v. Talley,* 108 F.3d 277, 279-81 (11th Cir.1997).

14

In sum, this case involves two substantial issues discussed herein—the Hobbs Act interstate commerce question and the mistaken "extortion" instruction. We believe this case reaches to the outer limits of interstate commerce involvement under the circumstances, but *Castleberry* guides us in the result reached. Also, we find the challenged jury instruction to constitute error, but it was not reversible error. Considering the instructions taken as a whole, along with the absence of a contemporaneous objection, the error was harmless.

We are mindful also of the severity of the sentences imposed for the armed robberies of two small local convenience stores. We determine, however, no error in the district court's imposition of the sentences under the guidelines.

Accordingly, we AFFIRM the convictions and sentences of both defendants.