In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3967 & 99-4159

United States of America,

Plaintiff-Appellee,

v.

George Peterson and Pedro Sandoval,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
Nos. 98-CR-193 & 98-CR-167--Rudy Lozano, Judge.

Argued September 19, 2000--Decided January 4, 2001

Before Bauer, Manion, and Kanne, Circuit Judges.

Bauer, Circuit Judge.   Pedro Sandoval and George
Peterson directly appeal their convictions for
robbery and attempted robbery affecting
interstate commerce and carrying a firearm during
the commission of these crimes. We reverse these
convictions.

BACKGROUND

Members of the Latin Kings gang learned that
James Estep, a man in his mid-sixties, sold
marijuana from his Hammond, Indiana home. In
January 1997, armed with this information and
weapons, Pedro Sandoval, George Peterson, and
four others, all gang members, robbed Estep in
his home. The robbers successfully carried away
thirty pounds of bricked marijuana, about $18,000
cash, and three guns. Estep, an avid gun
collector, housed well over thirty guns in a gun
case he built. Worried about the discovery of his
drug business, Estep did not report the robbery
to the police. He did, however, report that two
guns had been stolen from his van.

The gang members divided the booty among them.
Basking in their first success, Peterson,
Sandoval, and another gang member returned to
Estep's in February. This time they were thwarted
by Estep's daughter, Katherine Bohlke, who met
them at the door with a gun. Peterson fired his

gun, hitting Bohlke in the shoulder. As the gang members fled, Peterson tripped, causing his gun to discharge again. The bullet pierced a neighbor's wall, killing Steven Bodoki, a visitor to that home. This time Estep could not avoid the police. In fact, the FBI soon got involved because the Hammond police needed high-tech recording equipment in order to surveil the gang members. Soon thereafter, the federal government obtained arrest warrants for the gang members.

Sandoval and Peterson were indicted for the following violations under 18 U.S.C sec. 1951 and 18 U.S.C. sec. 924(c): Count 1--robbery of an enterprise affecting interstate commerce, January 1997; Count 2--carrying a firearm during the commission of this crime, January 1997; Count 3--attempted robbery of an enterprise affecting interstate commerce, February 1997; and Count 4--carrying a firearm during the commission of this crime, February 1997. The jury found Sandoval guilty on Counts 1, 3, and 4, and Peterson guilty on Counts 1 and 3. The judge sentenced Peterson to forty-five years, and Sandoval to forty years.
DISCUSSION

Defendants attack their conviction on two fronts. First, they posit that a recent Supreme Court decision requires the government to prove beyond a reasonable doubt that these robberies had a substantial effect on interstate commerce, rather than merely a de minimis effect. Second, they contend that even if the de minimis standard remains, the evidence presented to the jury was insufficient to meet that standard.

I.          Hobbs Act Jurisdictional Element

To uphold the tenets of federalism, in order to prosecute an individual under the Hobbs Act, the federal government bears the onus of proving that the accused's conduct affected interstate commerce. This proof differentiates Hobbs Act violations from common law robbery. How strong an affect on interstate commerce the Constitution demands is a question raised by defendants. The Hobbs Act provides, in part:
Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. sec. 1951(a). Thus, two elements must be proven: robbery and an effect on interstate

commerce. The Supreme Court has interpreted the statutory language of "in any way or degree" as "manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." Stirone v. United States, 361 U.S. 212, 215 (1960). We have long held that the government need only show some actual, even if de minimis, effect, or, where there is no actual effect, a realistic probability of an effect, on interstate commerce to bring robbery within its prosecutorial reach. See United States v. Bailey, 227 F.3d 792, 797 (7th Cir. 2000).

In this case, the defendants surmise that United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) mandates a higher showing. Specifically, they argue that a substantial affect on interstate commerce must be demonstrated, and that the use of the "depletion of assets" theory is precluded because robbery is not an economic activity. We start by noting that after the Court's opinion in United States v. Lopez, 514 U.S. 549 (1995), we construed the Hobbs Act as still requiring only a showing of a de minimis effect. See United States v. Stillo, 57 F.3d 553, 558 n.2 (7th Cir. 1995) (extortion case) ("Nor did the Lopez decision undermine this Court's precedents that minimal potential effect on commerce is all that need be proven to support a conviction."). Whether this recent case changes the standard is a new question of law, which we review de novo.

The Court in Morrison struck down 42 U.S.C. sec. 13981, which created a federal civil remedy for victims of gender-motivated violence. The Court likened sec. 13981 to the Gun-Free School Zones Act of 1990, struck down in Lopez, because there was no jurisdictional element establishing that "the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." 120 S.Ct. at 1751. The statute was found to exceed Congress' power because "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." Id. The Court said that generally the aggregation principle has only been applied when the regulated activity was commercial in nature. See id. at 1750. Accordingly, the Court rejected the "argument that Congress may regulate nonecomonic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." Id. at 1754.

Defendants argue that like gender-motivated violence in Morrison, robbery is not an economic activity, and thus aggregation cannot be employed. Defendants quote Lopez, 514 U.S. at

558, which states that "where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence," to argue that local robbery ought not be a federal crime. We rejected a similar argument in United States v. Wilson. See 73 F.3d 675, 684 (7th Cir. 1995) ("There is no authority for the proposition that Congress's power extends only to regulation of commercial entities. . . . [C]ourts have upheld numerous statutes which regulate private conduct that affects commercial entities or commercial activity."). We do not view the Hobbs Act as impermissibly regulating local conduct, that is, it does not regulate robbery for the sake of regulating robbery. Further, the Hobbs Act does not suggest that robbery is an economic activity; rather, the Hobbs Act regulates interference with economic activity by robbery. In other words, it does not federalize all robberies because all robberies per se affect interstate commerce; rather, it applies only to robberies with the proven effect. Unlike the Hobbs Act, the Morrison statute regulated gender-motivated violence wherever it occurred, not just violence directed at interstate commerce. Thus, aggregation is appropriate because what is aggregated is the depletion of the interstate entity's assets by robbery, and not the act of robbery alone.

As our brethren in the Tenth Circuit have recently reasoned in United States v. Malone, we do not believe Morrison undermines our prior holdings that a showing of a de minimis effect is constitutionally satisfactory. See 222 F.3d 1286, 1294-95 (10th Cir. 2000). Therefore, we uphold the de minimis standard because, in the aggregate, robbery of an interstate business has a substantial affect on commerce.

II.                    Sufficiency of Evidence

Our next inquiry is whether sufficient evidence was presented for the jury to find defendants guilty beyond a reasonable doubt. We lend great credence to a jury's verdict. Thus, a conviction will be overturned based on insufficient evidence only if the record reveals no evidence from which the rational jury could have found the defendants guilty beyond a reasonable doubt. See Bailey, 227 F.3d at 797. At trial, the government bore the burden of proving that the robbery affected interstate commerce. Our review of the trial transcript reveals that the government's proof was insufficient to satisfy the de minimis impact standard.

In its opening statement, the government told

the jury:

[T]here's an element that we are required to prove, not just that the crime occurred, but that there's a federal nexus or a federal involvement. And that, you will see from the instructions, is that interstate commerce was affected.

You will be hearing testimony from experts that this marijuana that was taken, and attempted to be taken, was grown outside of the State of Indiana. The weapons that were taken in the first robbery and attempted to be taken in the second, were manufactured outside of the State of Indiana. And, of course, United States currency, as I think most of you know, is not printed in the State of Indiana, but outside. Therefore, all three items that were taken in the first robbery and attempted to be taken in the second, had crossed state lines to be here in the State of Indiana.

Tr. at 202. During its case, the government presented three expert witnesses to help establish this jurisdictional theory.

The government called James Crane, a Special Agent with the United States Secret Service, as an expert in investigations involving United States currency. He testified, in part:
Q. Sir, are you familiar with the production of the United States currency?
A. Yes, I am.
Q. And where is the United States currency actually produced?
A. U.S. currency is produced in two places in the United States, one in Washington, D.C. at the Bureau of Engraving and Printing, and there's also another Bureau of Engraving and Printing in Fort Worth, Texas.

* * *

Q. Sir, with regards to United States currency which is found in the [S]tate of Indiana, what are any possible places of origin for that United States currency?
A. To be produced?
Q. Correct.
A. Nowhere in Indiana.

Tr. at 876, 878-79.

Seemingly, the purpose of Crane's testimony was to establish that the money taken and attempted to be taken by defendants from Estep was printed out-of-state, and thus was at one time in interstate commerce. To endorse this sort of showing would require an overly expansive interpretation of the Hobbs Act. As the Eleventh

Circuit intimated, "[w]e acknowledge that cash may 'travel' in interstate commerce but . . . . [w]e do not rest our decision on this weak reed." United States v. Paredes, 139 F.3d 840, 844 n.3 (11th Cir. 1998). This is because, practically speaking, under the government's theory, all robberies committed outside of Texas could be classified as federal crimes (as all robberies committed in Washington, D.C. are already so). In its brief, the government rightly "concedes that the out-of-state origin of the currency alone is insufficient to satisfy the commerce element of the Hobbs Act." We agree and hold that this testimony was inappropriate to establish the interstate commerce element under the Hobbs Act.

Another government witness was Eric Siweck, a DEA Special Agent and an expert in the enforcement of federal drug laws. Siweck, on direct examination, testified in part:

Q. If you were to recover brick marijuana, based on your investigations in Indiana, based on your training and experience, would the origin be from Indiana?
A. Normally, no. It would be from an area, you know, that could grow on a regular basis, would be my experience.
Q. And some of these areas are?
A. South America, Mexico, Southern States. They do grow in Texas, Arizona, Nevada, places that have a lot more growing days than we do here.

* * *

Q. Sir, have you had an opportunity prior to this trial today to speak with Mr. Estep . . . regarding some marijuana?
A. Yes, I have.
Q. And [was he] able to describe certain size of brick marijuana?
A. Yes, [he] did.
Q. And based on those conversations, your opinion would still be the same that marijuana of that size, which is brick, would be from another state?
A. Yes, in the content and the quality of the marijuana described, to me it's for cultivation, it's done by a grower for distribution. And the way it was described to me, it does not sound like it's Indiana grown.

Tr. at 886-87. On cross examination, Siweck testified:

Q. Mr. Siweck, you're saying it's still possible that the marijuana described by Louis Young and Mr. Estep could have been cultivated in Indiana?
A. It is possible, yes, sir.

Tr. at 887. On redirect, he responded:

Q. So when defense counsel asks you about a possibility, you indicate highly unlikely?
A. It is possible, highly unlikely, . . . but it is possible.

Tr. at 890. Estep, who had been given immunity by the government, had previously testified that he had sold marijuana from his home for about two years and was planning to sell the marijuana taken by defendants in January. Thus, the jury could rationally find that Estep operated a drug business and that its assets were depleted by the robberies. The question is whether the evidence could allow the jury to find that Estep's drug business was interstate in nature.

Traditionally, the government meets the de minimis standard under the "depletion of assets" theory. The government presents evidence that a business is either actively engaged in interstate commerce or customarily purchases items in interstate commerce, and had its assets depleted by the robbery, thereby curtailing the business' potential as a purchaser of such goods. See United States v. Elders, 569 F.2d 1020, 1025 (7th Cir. 1978). And, typically in Hobbs Act cases an owner or manager of the business establishment takes the stand to testify that the business robbed either served out-of-state customers or bought inventory manufactured out-of-state. See, e.g., United States v. Rodriguez, 218 F.3d 1243, 1245 (11th Cir. 2000) (desk clerk testified that motel robbed served out-of-state guests); United States v. Guerra, 164 F.3d 1358, 1359, 1361 (11th Cir. 1999) (owner and manager testified that gas station robbed sold fuel from out-of-state); United States v. Smith, 182 F.3d 452, 456 (6th Cir. 1999) (government provided evidence that stores robbed sold beer, wine, and tobacco originating out-of-state); United States v. Hebert, 131 F.3d 514, 523-24 (5th Cir. 1997) (managers and owners testified that restaurants and liquor stores robbed bought products from out-of-state); United States v. Brown, 959 F.2d 63, 68 (6th Cir. 1992) (distributor testified that it provided bar robbed with beer and food manufactured out-of-state).

Contrary to the above cited examples, the Hobbs Act does not require that the commerce affected be legal commerce. However, since Estep's illegal drug business was not a conventional commercial entity, it was especially important that the government prove the interstate nature of the business. The government needed to show the jury that Estep's marijuana source originated from out-of-state or that he sold drugs to out-of-state customers. For example, in United States v.

Thomas, we upheld a Hobbs Act conviction for obstructing interstate commerce when a drug seller robbed a drug buyer of money that would have been used to buy his cocaine. See 159 F.3d 296, 297 (7th Cir. 1998). The government offered evidence that cocaine originated in South America, and thus traveled through interstate commerce. See id. at 298. Likewise, in Bailey, we upheld a Hobbs Act conviction for attempted robbery. The defendant had targeted a drug supplier whom was suspected to possess on his person either cash from a cocaine sale or actual cocaine. See 227 F.3d at 798. The government called an expert to testify that cocaine is produced in South America, and therefore, it must enter Illinois via interstate commerce. See id. Thus, the cocaine dealer's assets were depleted because he had less means available to purchase more cocaine through interstate commerce. See id.

In this case, the government failed to adduce this benchmark form of proof, or any other satisfactory form. Siweck's testimony offered the jury qualified inferences-- namely that Estep housed cultivated marijuana, not "ditch weed," that cultivated marijuana "normally" comes from outside of Indiana, and that even though it was "possible" for the marijuana to be Indiana grown, it was "highly unlikely." Evidence on this element was not elicited from any other witness, including Estep, the witness with the most knowledge as to this matter. While cultivated marijuana may not "normally" be grown in Indiana, it is possible. See, e.g, United States v. Myers, 46 F.3d 668, 668-69 (7th Cir. 1995) (indoor marijuana growing operation found in Indiana). Based on this, we find that the inferences offered by Siweck were too attenuated to establish that Estep ran an interstate business. To render a guilty verdict, the jury must hear sufficient evidence to avoid resorting to excessively strained inferences or guesswork. The evidence of the source of the marijuana was based on strained inferences. In both Thomas and Bailey, the government garnered sufficient proof that the cocaine's source was South America. We are not saying that it is not possible that Estep's drug business was interstate in nature, we are saying that the government failed to adequately prove the possibility.

The government postures that it need not specifically show that the drugs were grown outside Indiana because "drug dealing is an economic activity that affects interstate commerce." (Citing United States v. Westbrook, 125 F.3d 996, 1009 (7th Cir. 1997) (quoting United States v. Rogers, 89 F.3d 1326, 1338 (7th Cir. 1996))). However, the government is conflating its burden of proof under two distinct

statutory schemes--the Controlled Substances Act ("CSA"), 21 U.S.C. sec.sec. 801 et seq. and the Hobbs Act, 18 U.S.C. sec. 1951. The statute at issue in Westbrook is part of the CSA, also enacted pursuant to Congress' Commerce Clause power. However, in enacting the CSA, Congress made specific findings and declarations codified in 21 U.S.C. sec. 801. These findings demonstrated that intrastate narcotic activity substantially affects interstate commerce. Based on these findings, when the government prosecutes a defendant under the CSA, it need not show that the conduct in the individual case affects interstate commerce. The Hobbs Act was not predicated on such findings; rather, the Hobbs Act requires individualized proof that the robbery charged affected interstate commerce. Therefore, it cannot be assumed that Estep's drug business was interstate in nature.

We find this case puzzling, particularly because of the government's trial theory. Lopez crafted three categories that Congress may regulate under its Commerce Clause power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. See 514 U.S. at 558-59. In its brief, the government spells out these categories and surmises that "the Hobbs Act as applied in this case served to protect 'persons or things in interstate commerce.'" The government then concludes that the "Hobbs Act conviction in this case [may be] sustained under the third as well as the second category of permissible Commerce Clause legislation described in Lopez." The defendants' counter that since this theory was not presented to the jury, it cannot sustain the convictions. Specifically, the defendants' brief states, "But the government, not thinking of the case as a Lopez category-two case, paid no attention at trial to its burden under that theory." Both parties misunderstand the import of the three Lopez categories. These categories are not suggested methods of proof; rather, they signal areas within Congress' power to regulate.

It appears that the government was attempting to prove that this Hobbs Act case fits into Lopez category two. Perhaps the government confused the Hobbs Act with statutes such as 18 U.S.C. sec. 2119, the federal carjacking statute, which states, in part: "Whoever, with the intent to cause death or serious bodily harm[,] takes a motor vehicle that has been transported, shipped or received in interstate commerce . . . ." Under this statutory language, we have found it sufficient to show that the stolen car had at some time traveled in interstate commerce. See

United States v. Taylor, 226 F.3d 593, 600 (7th Cir. 2000) (finding it sufficient that government proved that car was made in Kansas and stolen in Indiana); see also United States v. Bell, 70 F.3d 495, 498 (7th Cir. 1995) (finding it sufficient under 18 U.S.C. sec. 922(g)(1) to prove that firearm had at some point traveled in interstate commerce). Such statutes are enacted pursuant to Congress' Commerce Clause power under Lopez category two.

The Hobbs Act, however, falls within Lopez category three. The very language dictates that the government must show an effect on interstate commerce. Yet, the government argued to the jury that since the items taken-- the money, drugs, and guns--had crossed state lines at some point, interstate commerce was affected. But, the language of the Hobbs Act, as distinct from the federal carjacking statute, does not envision this type of showing. The government's proof should have focused on the nature of the business robbed and how the robbery affected its operation in interstate commerce; that is to say, that Estep sold drugs from an out-of-state source and that the robbery of the money and drugs depleted the assets of his business. On appeal, the government attempts to convert the case into one where the government proved that the robberies substantially affected interstate commerce because defendants robbed an interstate enterprise. Fatal to the government's appeal is that this theory was not presented to the jury, and thus, cannot support its verdict.

Finally, Jeffrey Emmons, a Special Agent with the United States Treasury Department, the Bureau of Alcohol, Tobacco and Firearms, an investigator of federal firearms violations, was called to testify as to the interstate nexus of the stolen firearms. Emmons testified that the guns taken and used in the robbery were not made in Indiana. The testimony concluded:

Q. Sir, the five weapons we have discussed today, you've indicated that none of those weapons were manufactured in Indiana, is that correct?
A. That's correct.
Q. So, in fact, if those weapons were recovered in Indiana, they did cross state lines?
A. That's correct.

Tr. at 682. The government abandons this approach on appeal. Instead, it argues that the guns were part of Estep's drug business because guns are necessarily part of the drug trade. No evidence was presented to this effect; actually the evidence was to the contrary. Estep testified that the guns were his personal property, and that the guns were "home when they c[a]me to my

house." Tr. at 844. According to the record, Estep was a gun collector, separate and apart from his drug business, and he was not a gun seller. Estep even testified that he had never used drug money to purchase guns. The government's argument here is baseless, the evidence did not show that the guns were part of Estep's business, and it did not show that Estep's business was interstate.

In light of our analysis as to the money and drugs, we decline to further address the sufficiency of the gun proof because "[w]hen a verdict may have rested on any of several grounds, one of which was improper, the conviction cannot be upheld." United States v. Feldman, 711 F.2d 758, 764 (7th Cir. 1983) (citing Stromberg v. California, 283 U.S. 359, 368 (1931); United States v. Baranski, 484 F.2d 556, 560-61 (7th Cir. 1973)); see Feela v. Israel, 727 F.2d 151, 154-55 (7th Cir. 1984). The fact that the jury might have solely relied on Crane's testimony regarding the money is of concern. Crane's only purpose in testifying was to show that the money was not printed in Indiana. His testimony was clear and unqualified, and thus provided an easy avenue for the jury to find that the interstate commerce element was satisfied. Also, the evidence as to the source of Estep's marijuana was insufficient to satisfy the interstate commerce element. Since the verdict was general, the jury may well have rested its decision that the robberies affected interstate commerce on the drug or money evidence, both improper grounds.

CONCLUSION

We conclude that the Supreme Court's decision in Morrison did not alter the showing required to satisfy the jurisdictional element of the Hobbs Act. Since evidence beyond a reasonable doubt as to any impact on interstate commerce is lacking to sustain the Hobbs Act convictions, we hereby REVERSE defendants' convictions.