**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert A. ESPINOZA, a/k/a "Casper", Defendant–Appellant.**

**No. 02–1596.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 2002.

Decided Dec. 5, 2002.

Rehearing En Banc Denied Jan. 16, 2003.

Before BAUER, EASTERBROOK, and MANION, Circuit Judges.

ORDER

Robert Espinoza was charged with racketeering; conspiring to commit racketeering; conspiring to distribute and possess with intent to distribute marijuana; unlawful possession of a firearm; and using and carrying a firearm (aiding and abetting), during and in relation to the racketeering offense. The jury found Espinoza guilty

of these offenses, and the district court sentenced him to 600 months in prison. Espinoza appeals his convictions, and we affirm.

## I.

On May 18, 2001, the defendant, Robert A. Espinoza (a.k.a."Casper") and four other members of the Quad Cities Bishops ("QC Bishops")[1] were indicted in connection with ten counts of racketeering-related crimes. Nine of the racketeering crimes were specified and involved acts of drug trafficking, arson, and murder. Espinoza was charged in Count One with racketeering, in violation of 18 U.S.C. § 1962(c), a charge predicated on six racketeering acts–one of drug trafficking in violation of federal law and five of residential arson in violation of Illinois law. In Count Two, Espinoza was charged with conspiring to commit racketeering in violation of 18 U.S.C. § 1962(c). Count Five charged Espinoza with conspiring to distribute and possess, with intent to distribute, marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846. In Count Six, Espinoza was charged with unlawful possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). Finally, in Count Seven, Espinoza was charged with using and carrying a firearm (aiding and abetting), as defined by 18 U.S.C. § 921(a)(4), during and in relation to the racketeering offense specified in Count One in violation of 18 U.S.C. § 924(c)(1)(A)-(C).

On November 6, 2001, the jury found Espinoza guilty on all counts. Additionally, the jury found in special interrogatories, accompanying the verdict form, that the six racketeering acts alleged with respect to Espinoza had been proven. On March 1, 2002, the district court sentenced Espi-noza to 600 months' imprisonment. Espinoza appeals his convictions.

## II.

Espinoza raises two issues on appeal: (1) whether there was sufficient evidence that the QC Bishops engaged in, or their activities affected, interstate commerce; and (2) whether the district court abused its discretion when it denied his motions for a mistrial.

### A. Sufficiency of evidence challenge.

In challenging his racketeering and racketeering conspiracy convictions, Espinoza argues that the QC Bishops was a defunct street gang that did not engage in, and whose activities did not affect, interstate commerce. This court reviews a sufficiency of evidence challenge by considering the evidence in the light most favorable to the government, deferring to the credibility determinations of the jury, and overturning a verdict only when the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt. *United States v. Hickok*, 77 F.3d 992, 1002 (7th Cir.1996). Furthermore, in bringing this challenge, Espinoza faces a nearly insurmountable hurdle, because in determining whether there was sufficient evidence to sustain a guilty verdict, all conflicts in the evidence are resolved in favor of the government. *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir.1997).

Section 1962(c) of the Racketeer Influenced and Corrupt Organization Act ("RICO") provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or

---

1. The QC Bishops are an offshoot off the Bishops, known to its members as the Almighty Bishops Nation, a Chicago street gang. Espinoza was the leader of the QC Bishops from January 1998 until the summer of 1999.

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In a RICO prosecution, "the government carries the burden of establishing an effect on interstate commerce." *United States v. Farmer*, 924 F.2d 647, 651 (7th Cir.1991). Under § 1962(c), however, "[a] minor or minimal influence on interstate commerce is sufficient." *Id.* As such, the "'required nexus between the activities of the enterprise and interstate commerce need not be great.'" *Id.* (citation omitted). Additionally, to satisfy the interstate element of the RICO statute, "it is the enterprise and not the individual defendants that must engage in or affect interstate commerce." *Id.*

■ Espinoza contends that the QC Bishops gang was not engaged in, nor did its activities affect, interstate commerce because the evidence submitted by the government was insufficient to "show the existence of a trafficking enterprise and a pattern of narcotics racketeering adopted by ... [him] in his management and participation through the enterprise." More precisely, he asserts that the marijuana conspiracy is the enterprise's *only* link to interstate commerce, and as such the government cannot meet its burden of establishing that the QC Bishops's activities bore a "sufficient" nexus to interstate commerce. Espinoza contends that after the Supreme Court's decisions in *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (holding that the Violence Against Women Act lacked the jurisdictional element necessary to establish that the federal cause of action provided by that statute was in pursuance of Congress's power to regulate interstate commerce), *and United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (holding that the Gun–Free School Zones Act of 1990 lacked the jurisdictional element necessary to ensure,

through a case-by-case inquiry, that the activity in question affected interstate commerce), the government, in a RICO prosecution, must show that the enterprise's activity had a substantial effect on interstate commerce. We disagree. As we noted in *United States v. Peterson*, 236 F.3d 848 (7th Cir.2001), in *Morrison* and *Lopez* the Supreme Court struck down the Violence Against Women Act and the Gun–Free School Zones Act of 1990 because neither contained a jurisdictional element establishing that the federal causes of action contained in those statutes were in pursuance of Congress's power to regulate commerce. *Id.* at 852. In *Peterson*, we concluded that the Court's decisions in *Morrison* and *Lopez* do not undermine "our prior holdings that a showing of a *de minimis* effect [on interstate commerce in a Hobbs Act prosecution] is constitutionally satisfactory," 236 F.3d at 852, noting:

> We do not view the Hobbs Act as impermissibly regulating local conduct, that is, it does not regulate robbery for the sake of regulating robbery.... [T]he Hobbs Act does not suggest that robbery is an economic activity; rather, the Hobbs Act regulates interference with economic activity by robbery. In other words, it does not federalize all robberies because all robberies per se affect interstate commerce; rather, it applies only to robberies with the proven effect.

236 F.3d at 852.

Like the Hobbs Act, RICO contains the jurisdictional element necessary to establish that the statute was enacted pursuant to Congress's power to regulate commerce. 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise *engaged in, or the activities of which affect, interstate or foreign commerce*, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs...."); *United*

*States v. Marino,* 277 F.3d 11, 35 (1st Cir.2002) (holding that after *Morrison* and *Lopez* the government does not have to show, in a RICO prosecution, that the enterprise's activities had a substantial effect on interstate commerce, only that the enterprise's activities had a *de minimis* effect on interstate commerce). Thus, while our decision in *Peterson* involved the Hobbs Act rather than RICO, the principle enunciated in *Peterson* is equally applicable in the RICO context. *See United States v. Chance,* 306 F.3d 356, 374 (6th Cir.2002) (holding that "[l]ike RICO, the Hobbs Act only requires a showing of a de minimis connection with interstate commerce").

■ Here, there is no question that the evidence submitted by the government was sufficient to establish a *de minimis* nexus between the activities of the QC Bishops's enterprise and interstate commerce. During Espinoza's tenure as the leader of the QC Bishops, he was involved in a 50–pound marijuana trafficking conspiracy, which he concedes was done in interstate commerce.[2] By demonstrating the existence of this conspiracy, the government met its burden under § 1962(c). *See, e.g., Farmer,* 924 F.2d at 651 (holding that the possession of a drug scale in Illinois that was manufactured in New Jersey supported RICO conviction); *United States v. Alvarez,* 860 F.2d 801, 820 (7th Cir.1988) (holding that agent's testimony that defendant participated in two heroin sales with him was sufficient to satisfy the government's "minimal burden" under § 1962(c)).[3]

**B. Espinoza's motions for mistrial.**

We next consider Espinoza's argument that the district court abused its discretion by failing to grant his motions for a mistrial. *See, e.g., United States v. Miller,* 276 F.3d 370, 373 (7th Cir.2002) (noting that "[w]e review for abuse of discretion the district court's denial of a mistrial motion"). This circuit evaluates a district court's decision denying a mistrial "deferentially because a trial judge is in the best position to determine whether an incident is serious enough to warrant the drastic step of declaring a mistrial." *Id.*

Espinoza argues that "gratuitous" references to murder or murder(s) during the trial, as well as an incorrect jury instruction mentioning murder, denied him a fair trial. One of the references to murder occurred during the recross examination of Officer Robert McNabb–a government fact witness and gang expert–by defense counsel. Prior to defense counsel's recross-examination, government counsel asked McNabb, on redirect examination, about the QC Bishops's rivalry with another gang, the Surenos. In particular, government counsel asked McNabb about "an incident involving a Sureno named Ali McDonald." Defense counsel objected, arguing that "this line of testimony involv[es] a particular incident ... beyond the scope of my cross-examination." The district court judge sustained the objection, and government counsel requested a sidebar:

> Government Counsel: I just want to make sure I don't ask something I'm

---

**2.** Espinoza received the marijuana in Chicago and distributed it in Quad Cities, Illinois/Iowa.

**3.** On appeal, the government also contends that the gang's possession of firearms shipped in interstate commerce satisfies its burden of proof under § 1962(c), relying on *United States v. Juvenile Male,* 118 F.3d 1344, 1349 (9th Cir.1997) (holding that RICO's require-

ment of *de minimis* effect on interstate commerce was proven because, *inter alia,* " 'the firearm used during the robbery had moved in interstate commerce, and the reason for the robbery was to obtain additional firearms (which has a potential impact on interstate commerce.' "). Because the QC Bishops's drug trafficking satisfies the government's statutory burden under § 1962(c), we need not address the merits of this argument.

not supposed to. This particular incident resulted in a murder. I was not going to bring that out, but I was going to bring out the fact that weapons were involved other than–other than fisticuffs or baseball bats, because the suggestion I got from [defense counsel's] cross-examination was that, well, these guys are just fighting with their fist and baseball bats and that kind of stuff, but in fact a knife was used. This guy was stabbed. I was going to go that far, to bring out the fact that a knife was used in the fight.

District Court: He's already testified that knives as well as guns, firearms, are used, but I didn't want you to get into this incident about Ali McDonald, because that goes beyond–simply saying using knives is fine, but to go into the incident is going beyond the scope of redirect.

Government Counsel: Can I just ask him if a knife was used in this particular confrontation?

District Court: (Nodded head up and down). . . . I think it would be proper redirect to go into the topic that there were knives used, and he can testify about his [McNabb's] personal observation seeing knives used on this occasion by the Bishops. But I think we don't need to go into great detail about–

Government Counsel: No. I don't–

District Court: –what happened. That's the only part here that's–

Government Counsel: No. I don't want to go into the nature of the injury or–I'll ask him a very narrow question or leading question to avoid bringing out anything about what happened–happened to this guy . . .

Tr. Vol. 3, 264, 266.

After the sidebar, government counsel resumed his redirect examination of Officer McNabb, during which the following exchange took place:

Government Counsel: We were talking about this incident involving a number of people, one of whom was an individual named Ali McDonald. Correct?

Officer McNabb: Yes, sir. . . .

Government Counsel: And during the course of the altercation [between the Bishops and the Surenos], was a knife used–

Officer McNabb: Yes.

Government Counsel: –by the Bishops?

Officer McNabb: Yes.

Tr. Vol 3, 268, 275.

During defense counsel's recross examination of Officer McNabb, the following exchange took place:

Defense Counsel: When did you write a report in relation to the incident?

Officer McNabb: A little while after it happened, after the murder.

Tr. Vol. 3, 278.

Defense counsel did not object, but later, during another sidebar, raised the issue, claiming that the officer's use of the word murder was "gratuitous." The district court judge concluded that Officer McNabb's reference to murder was "inadvertent," noting that "[the comment] didn't even register with me, and I'm listening very closely."

Another reference to murder occurred during the testimony of Frank Rivas, a former member of the Chicago and QC Bishops. Government counsel, in an effort to elicit that Rivas had entered into a plea agreement based on his testimony in two state murder trials, asked Rivas "And was that [plea agreement] in exchange for your cooperation . . . in a particular case?" Rivas replied, "A murder case, yes." Once again, defense counsel did not object, but on cross-examination suggested that Rivas was biased, having entered into a favorable plea agreement. Then, as defense counsel

attempted to impeach Rivas with a prior inconsistent statement to authorities, the following exchange took place:

> Defense Counsel: You didn't mean to lie to [the authorities], did you?
>
> Mr. Rivas: At that time, I was more negotiating—it was over—it wasn't over drug charges, it was over a murder case. That's why I was cooperating with them.

In order to clarify any misimpression by the jury that Rivas had committed a murder, government counsel asked the following questions of Rivas on redirect examination:

> Government Counsel: Mr. Rivas, just try to clear this up, this issue that was raised by [defense counsel], you were prosecuted on state charges because you were cooperating in a murder investigation involving a murder that was committed by ... one Quad City Bishop ... and ... a Chicago Bishop. Correct?
>
> Mr. Rivas: Yes.

Defense counsel did not object to this testimony, but instead asked Rivas more questions to clarify that the drug dealing and murder that he was testifying about predated Espinoza's tenure as the leader of the QC Bishops.

The final reference to murder took place when the district court judge read the jury its instructions. The judge inadvertently read the wrong version of Government Instruction 28B, which indicated that "[t]he term 'racketeering activity' includes acts involving murder, acts involving arson, and felonious dealing in controlled substances."

■ We conclude that these isolated references to "murder" are insufficient to demonstrate that the district court abused its discretion by denying the defendant's motions for mistrial. We reach this determination because even assuming that the references constituted error, any such error was harmless. A *harmful* error results only if the error has a substantial and injurious effect or influence on the jury's verdict. *Moore*, 115 F.3d at 1358. Other than unsubstantiated allegations of prejudice, Espinoza has given us no reason to conclude that the three scattered references to murder—made over the course of a two-week trial that included 146 exhibits and testimony from 48 different witnesses—were so prejudicial as to warrant a mistrial. *See United States v. Hardin*, 209 F.3d 652, 664 (7th Cir.2000) (holding that nine references to gang affiliation that were not probative of guilt were harmless due to their scattered nature over the course of a 12–day trial involving 42 witnesses). It also important to note that, with respect to the jury instruction, the district court judge gave the jury a cautionary instruction drafted by defense counsel, directing jurors that any reference to a murder was inadvertent and did not involve Espinoza. *See United States v. Martin*, 189 F.3d 547, 555 (7th Cir.1999) (holding that a cautionary instruction negated any prejudice stemming from judge's comments); *United States v. Hall*, 165 F.3d 1095, 1116 (7th Cir.1999) (holding that trial judges have broad discretion in determining whether a cautionary instruction as opposed to a mistrial will prevent any possible prejudice, and that it is assumed juries will follow the court's instructions). Given the foregoing, as well as the wealth of evidence presented by the government against Espinoza, we conclude that the district court did not abuse its discretion in denying his motions for a mistrial.

## III.

For the reasons stated herein, the district court's judgment is AFFIRMED.