UNITED STATES of America, Plaintiff-Appellee,

v.

Samuel GRAY, a.k.a. "Pokey", Defendant-Appellant.

No. 00-11491.

United States Court of Appeals,

Eleventh Circuit.

Aug. 7, 2001.

Appeal from the United States District Court for the Northern District of Georgia. (No. 99-00386-CR-1), Richard W. Story, Judge.

Before BIRCH, MARCUS and WOOD[*], Circuit Judges.

MARCUS, Circuit Judge:

Defendant Samuel Gray appeals his conviction and sentence for Hobbs Act robbery, 18 U.S.C. § 1951, and for using and carrying a firearm during the robbery, 18 U.S.C. § 924(c). Gray's principal argument is that the Government failed to prove that the conduct giving rise to the robbery charge had a sufficient effect on interstate commerce, as required by the Hobbs Act. Gray basically acknowledges that, under binding Eleventh Circuit precedent, the Government need only show that the defendant's conduct had a minimal effect on commerce. According to Gray, however, recent Supreme Court doctrine effectively overrules our precedent and requires proof beyond a reasonable doubt of a substantial effect on commerce. *See United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); *see also Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). Gray also contends that, even under the minimal effect standard, the Government failed to meet its burden. In addition to these claims regarding the Hobbs Act conviction, Gray raises several purely legal challenges to his indictment and sentencing.

Having carefully considered the parties' arguments and the relevant portions of the record, we find no reversible error, and therefore affirm. We also conclude that nothing in *Morrison* or *Jones* alters our previous conclusion that, to convict a defendant for Hobbs Act robbery, the Government must prove a minimal, but not substantial, effect on interstate commerce.

I.

The following facts were established at trial. On February 4, 1999, a robbery occurred at the Church's

---

[*]Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

Chicken restaurant at 629 Cascade Avenue in Atlanta. Several employees of the restaurant identified Gray as the robber. They testified that Gray displayed a handgun during the robbery. They also testified that, after entering the restaurant, Gray vaulted over a counter, threw the top of a cash register on the floor, seized the register's money drawer, then jumped back over the counter and fled with the drawer and its contents.

In the wake of the robbery, the restaurant closed its doors for up to several hours while police interviewed witnesses in the dining area (although the drive-in window remained open). The incident and subsequent closure of the dining area occurred around 5 p.m., a relatively busy period for the restaurant. Although the amount of cash in the stolen money drawer was not established at trial, it was uncontested that the drawer was not empty and did contain cash. The Vice President of the company that owns the restaurant testified that the restaurant does significant business in interstate commerce, purchasing the vast majority of its food products (other than chicken), uniforms, and equipment from suppliers in states other than Georgia.

On July 27, 1999, a federal grand jury indicted Gray on two charges relating to the robbery. Count I of the indictment charged Gray with a violation of the Hobbs Act, 18 U.S.C. § 1951, and alleged that he unlawfully obstructed, delayed, and affected interstate commerce by taking from the restaurant approximately $300 and the money drawer. Count II charged Gray with knowingly "us[ing] and carry[ing] a firearm" during and in relation to the robbery, in violation of 18 U.S.C. § 924(c).

Before trial, the Government served a sentencing information setting forth Gray's prior convictions—a 1990 conviction on two counts of robbery and a 1979 conviction for rape—and indicated its intent to seek a mandatory life sentence under 18 U.S.C. § 3559(c)(1), the so-called "three strikes" statute.[1] The case was tried to a jury on November 9-10, 1999. At the close of the Government's case, and again at the close of the evidence, Gray moved unsuccessfully for entry of a judgment of acquittal. The jury convicted Gray on all counts.

The PSI concluded that Gray was subject to a mandatory life sentence under § 3559(c)(1) by virtue of his conviction on Count I. The PSI noted Gray's two prior convictions, and also noted that Gray had used a dangerous weapon (a screwdriver) as an offensive weapon in the robberies giving rise to his 1990 conviction. The PSI concluded as well that Gray was subject to a consecutive seven-year sentence on Count II because he had brandished a firearm during the robbery, *see* 18 U.S.C. § 924(c)(1)(A)(ii), and additionally

---

[1]The 1990 conviction related to charges that Gray perpetrated two armed robberies on or about the evening of August 26, 1989. These charges were resolved on March 9, 1990, when Gray pled guilty in Georgia state court to two counts of simple robbery.

that Gray was liable for restitution.

Gray raised multiple objections to the PSI. Among other things, Gray asserted that § 3559(c)(1) is unconstitutional to the extent it puts the burden on the defendant to prove by clear and convincing evidence that a prior robbery conviction should not count as a "strike" because no dangerous weapon was used. *See* 18 U.S.C. § 3559(c)(3)(A). Gray also asserted that he was subject to only a five-year sentence on Count II because the indictment did not allege expressly, and the Government did not prove to the jury, that he brandished a firearm during the robbery giving rise to this case. The district court rejected these arguments.

At the ensuing sentencing hearing, Gray testified that he had not used a screwdriver or any other weapon during the 1989 robberies. On cross-examination, however, Gray admitted that, during entry of his guilty plea to the 1989 robberies, the prosecutor stated the facts of the case, including the fact that the Gray had held up the victim of the second robbery with a screwdriver. Gray further admitted that he responded "Yes" when asked by the court taking his plea whether the facts stated by the prosecutor were correct. The Government also introduced testimony from the police officer who apprehended Gray after the second robbery. The officer recounted witness statements indicating that Gray had used a screwdriver in both of the robberies for which he was arrested in 1989.

The district court ultimately sentenced Gray in accordance with the PSI, finding that the robberies giving rise to the 1990 conviction involved a dangerous weapon and therefore the conviction was a "strike" for purposes of § 3559(c)(1). Pursuant to that finding, the Court imposed a life sentence on Count I, and further imposed a consecutive seven-year sentence on Count II. The court also ordered the payment of $3,600 in restitution, based on testimony at the sentencing hearing that the stolen money drawer contained $130-150 in cash and the cash register damaged during the robbery had cost $3,240.

II.

Gray raises four issues on appeal. First, he contends that the district court should have granted his motion for acquittal on the Hobbs Act charge because the Government failed to introduce any evidence that his conduct had the required effect on interstate commerce. Second, he asserts that § 3559(c)(3)(A)—a portion of the "three strikes" statute—unconstitutionally places the burden on the defendant to prove by clear and convincing evidence that no dangerous weapon was used in connection with a robbery conviction that otherwise would trigger a mandatory life sentence. Third, he argues that the sentence enhancement of § 924(c)(1)(A)(ii) for "brandish[ing]" a firearm is inapplicable because that specific allegation must be, but was not, set forth in the indictment and proved at trial. Finally, he contends that Count I of the indictment was

defective because it failed to allege mens rea, which he says is an essential element of a Hobbs Act charge.

We review the first three of these issues de novo. *See, e.g., United States v. Diaz,* 248 F.3d 1065, 1084 (11th Cir.2001) ("Whether sufficient evidence was presented at trial to support appellants' convictions is a question of law subject to de novo review."); *United States v. Pistone,* 177 F.3d 957, 958 (11th Cir.1999) ("The interpretation of a statute is a question of law subject to de novo review."); *United States v. Osburn,* 955 F.2d 1500, 1503 (11th Cir.1992) (constitutionality of statute is reviewed de novo). The fourth issue was not raised in the district court, and therefore, as discussed below, our review is constrained. *See United States v. Adams,* 83 F.3d 1371, 1375 (11th Cir.1996).

## III.

We first address Gray's argument that the Government failed to prove the effect on interstate commerce required by the Hobbs Act. Gray does not dispute that, under this Circuit's binding precedent, a conviction for Hobbs Act robbery may be sustained if there is proof that the defendant's conduct had even a minimal effect on interstate commerce. *See, e.g., United States v. Rodriguez,* 218 F.3d 1243, 1244 (11th Cir.2000) ("The government needs only to establish a minimal effect on interstate commerce to support a violation of the Hobbs Act.") (citing *United States v. Guerra,* 164 F.3d 1358, 1360 (11th Cir.1999) and *United States v. Castleberry,* 116 F.3d 1384, 1387 (11th Cir.1997)). Gray contends, however, that recent Supreme Court doctrine overrules our precedent. Gray also contends that, even under our current precedent, the Government in this case failed to prove a minimal effect on commerce. For the reasons stated below, we reject both of these arguments.

The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do ... shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). The Act broadly defines "commerce" as being "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." *Id.* § 1951(b)(3). In *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the Supreme Court confirmed the expansive scope of the statute, explaining that it "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with

interstate commerce by extortion, robbery, or physical violence. The Act outlaws such interference 'in any way or degree.' " *Id.* at 215, 80 S.Ct. at 272 (quoting § 1951(a)); *see also United States v. Culbert,* 435 U.S. 371, 373, 98 S.Ct. 1112, 1113, 55 L.Ed.2d 349 (1978) (explaining that the words of the Hobbs Act "do not lend themselves to restrictive interpretation").

As dictated by the expansive language of the Hobbs Act prohibiting robbery or extortion that "in any way or degree, obstructs, delays, or affects commerce," 18 U.S.C. § 1951(a), we have repeatedly held that the jurisdictional requirement may be met simply by showing that the offense had a minimal effect on commerce, and in so doing have rejected any requirement that the impact on commerce be substantial. *See, e.g., United States v. Le,* No. 00-11124, --- F.3d ---- (11th Cir. July 11, 2001) ("In the case of a substantive Hobbs Act offense, the 'impact on commerce does not need to be substantial; all that is required is minimal impact.' ") (quoting *United States v. Kaplan,* 171 F.3d 1351, 1354 (11th Cir.1999) (en banc)); *Rodriguez,* 218 F.3d at 1244; *Guerra,* 164 F.3d at 1360; *United States v. Paredes,* 139 F.3d 840, 844 (11th Cir.1998); *Castleberry,* 116 F.3d at 1387; *United States v. Jackson,* 748 F.2d 1535, 1537 (11th Cir.1984); *United States v. Hyde,* 448 F.2d 815, 837 (5th Cir.1971).

We have also repeatedly rejected the argument that the minimal effect standard was altered by the Supreme Court's decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Castleberry,* for example, we considered whether *Lopez*—a case addressing the constitutionality of the Gun-Free School Zones Act, 18 U.S.C. § 922(g)—had any effect on the "the measure of evidence necessary to support the interstate commerce element of a Hobbs Act prosecution." 116 F.3d at 1386 (internal quotation and citation omitted). We held that it did not and distinguished *Lopez,* observing that the Hobbs Act contains an explicit jurisdictional element, *see* 18 U.S.C. § 1951(a), while the Gun-Free School Zones Act did not. 116 F.3d at 1387. This Court expressly continued to hold that "the Government only needs to establish a minimal effect on interstate commerce to support a violation of the Hobbs Act." *Id.* Subsequent decisions from this Court have reiterated our decision in *Castleberry* and confirmed, again and again, that even after *Lopez* a conviction for Hobbs Act robbery requires proof of a minimal, not substantial, effect on commerce. *See Rodriguez,* 218 F.3d at 1244-45; *Guerra,* 164 F.3d at 1360; *Paredes,* 139 F.3d at 844.

Gray asserts that a more recent Supreme Court decision, *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), supports his argument that a substantial effect is required under the Hobbs Act. Other Circuits considering this issue have held that neither *Morrison* nor another recent

Commerce Clause decision, *Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), alters the long-standing minimal effect requirement. *See United States v. Peterson,* 236 F.3d 848, 852 (7th Cir.2001); *United States v. Malone,* 222 F.3d 1286, 1294-95 (10th Cir.2000). We agree.

In *Morrison,* the Supreme Court held that the civil remedy provision of the Violence Against Women Act of 1994 ("VAWA"), 42 U.S.C. § 13981, could not be sustained under the Commerce Clause. In striking down § 13981, the Court relied upon the fact that § 13981, like the Gun-Free School Zones Act struck down in *Lopez,* attempted to regulate non-economic criminal conduct. 529 U.S. at 610-11, 120 S.Ct. at 1750. According to the Supreme Court, the "aggregation" theory—the theory invoked by courts to explain why only a minimal effect on commerce is necessary for any particular Hobbs Act violation—was inapplicable to the VAWA. *See id.*[2] The Court opined that generally the aggregation principle has only been applied when the regulated activity is commercial in nature. *See id.* The Court therefore rejected the proposition that "Congress may regulate nonecomonic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce"—which is what the Court found that Congress attempted to do in VAWA. *Id.* at 617, 120 S.Ct. at 1754. Moreover, the Court pointed out that § 13981, again like the Gun-Free School Zones Act addressed in *Lopez,* contained no jurisdictional element establishing that "the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Id.* at 613, 120 S.Ct. at 1751.

*Morrison* does not alter our Hobbs Act precedent. Unlike the statute at issue in *Morrison,* the Hobbs Act plainly and undeniably regulates economic activity. *Compare Morrison,* 529 U.S. at 613, 120 S.Ct. at 1751 ("Gender-motivated crimes of violence [regulated by VAWA] are not, in any sense of the phrase, economic activity."); *compare also Lopez,* 514 U.S. at 561, 115 S.Ct. at 1630-31 (Gun-Free School Zones Act "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms."). Robbery, even though accompanied by actual or threatened physical harm, is undeniably an *economic* crime that involves the involuntary transfer of

---

[2]Under the aggregation theory, economic activity that may not itself substantially affect interstate commerce may be regulated under the Commerce Clause if that conduct, in the *aggregate,* would have such a substantial effect. *See Wickard v. Filburn,* 317 U.S. 111, 127-28, 63 S.Ct. 82, 90-91, 87 L.Ed. 122 (1942) (observing that "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"). We have often invoked the aggregation theory to explain why the Government need not prove a substantial effect on commerce in each Hobbs Act robbery prosecution it pursues. *See Guerra,* 164 F.3d at 1361 ("[A]n individual defendant's conduct need not substantially affect commerce precisely because the Hobbs Act regulates general conduct—robberies and extortion—which in the aggregate affects commerce substantially.").

economically valuable assets. The relationship between robbery and commerce is clear, direct, and unattenuated. Robbery deprives the victim of its ability to use money or property in commerce as it sees fit, while enabling the perpetrator to use money or property that he otherwise would not possess. Accordingly, the Supreme Court's rejection of an aggregation theory for at least some instances where Congress seeks to criminalize *non-economic* conduct is wholly inapposite.

The legislative history of the Hobbs Act confirms that the ultimate purpose of the statute was to regulate harmful economic activity. *See Stirone,* 361 U.S. at 215, 80 S.Ct. at 272 (discussing legislative history and explaining that "[i]t was to free commerce from ... destructive burdens that the Hobbs Act was passed"); *United States v. Golay,* 560 F.2d 866, 868 (quoting one of the Act's proponents as stressing that the measure was designed to " 'protect interstate commerce from robbery and extortion, no matter by whom these crimes were committed' ") (citing 91 Cong. Rec. 11904 (1945) (statement of Rep. Gwynne)). Although the impetus for the Act and the primary subject of Congressional debate was a perceived loophole in prior law that exempted certain extortionate practices by organized labor, the Act's robbery provisions were not limited to illegal labor activities. Nor were the robbery provisions meant only to combat organized crime. *See Culbert,* 435 U.S. at 376, 98 S.Ct. at 1115 (rejecting argument that robbery must constitute racketeering to give rise to Hobbs Act liability).

There is simply no suggestion in *Morrison,* or its predecessor *Lopez* for that matter, that the Court has now eliminated the aggregation theory in instances where Congress seeks to criminalize certain economic activity. On the contrary, the *Morrison* Court identified *Wickard*—the seminal "aggregation" case—to support the proposition that " '[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.' " 529 U.S. at 610, 120 S.Ct. at 1750 (quoting *Lopez,* 514 U.S. at 560, 115 S.Ct. at 1630). Economic activity, or more precisely the infliction of economic harm, is at the heart of the Hobbs Act's prohibition on robbery, and this subject is well within the permissible scope of Congress's regulatory authority under the Commerce Clause.

In addition, unlike the VAWA, the Hobbs Act contains an explicit jurisdictional element confirming that the Act was indeed passed pursuant to Congress's power to regulate interstate commerce. As noted above, the Hobbs Act provides for the punishment of "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do...." 18 U.S.C. § 1951(a). The Act also defines commerce to include "all

commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof. and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3). Quite simply, there can be no question that Congress, in enacting the Hobbs Act, sought to regulate economic activity pursuant to its powers under the Commerce Clause. These important distinctions highlight why *Morrison* does not alter our Hobbs Act jurisprudence.

*Jones* (a decision not cited by Gray) likewise does not alter our Hobbs Act precedent. In *Jones,* the Supreme Court examined the federal arson statute which makes it a federal crime to damage or destroy "by means of fire or an explosive, any ... property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce...." 18 U.S.C. § 844(i). The Court determined that arson of an owner-occupied private residence did not fall within the scope of § 844(i). *See* 529 U.S. at 856, 120 S.Ct. at 1910-11. In reaching this conclusion, the Court relied upon the language of § 844(i), which contains the qualifying words "used in" interstate or foreign commerce. The Court found that the word "used" signaled that Congress expected that the damaged or destroyed property "must *itself* have been used in commerce or in an activity affecting commerce." *Id.* at 855, 120 S.Ct. at 1909-10 (emphasis added). The Court then determined that the phrase "used in ... commerce" meant that the building must have been actively used for commercial purposes. *See id.* The Court explained that this conclusion avoided the constitutional problems that would be posed by federal regulation under the Commerce Clause of a traditionally state crime (arson) affecting only non-commercial activity. *See id.* at 857-58, 120 S.Ct. at 1911-12.

Unlike the federal arson statute, the Hobbs Act has no qualifying language indicating that Congress intended to limit the Act's jurisdictional reach. Instead, the language of the Hobbs Act indicates Congress's intent to invoke its full authority under the Commerce Clause. *See id.* at 854, 120 S.Ct. at 1909 (explaining that when Congress uses the words "affecting commerce" without qualification, it intends to invoke its full authority under the Commerce Clause). The Hobbs Act does not, on its face, suggest that Congress intended to limit its jurisdiction in any way. Indeed, we have often explained that the Act " 'manifest[s] a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.' " *Rodriguez,* 218 F.3d at 1244 (quoting *Stirone,* 361 U.S. at 215, 80 S.Ct. at 272); *see also Kaplan,* 171 F.3d at 1357. Moreover, as discussed above, the kinds of concerns voiced in *Jones* about the constitutionality of Commerce Clause-based regulation of non-commercial activity are not apposite to the Hobbs Act and are even less apposite to this case involving the robbery of a commercial

establishment.

We therefore hold that the Supreme Court's decisions in *Morrison* and *Jones* (neither of which even addresses the Hobbs Act) do not undermine this Court's Hobbs Act case law—which we are bound to follow. More particularly, *Morrison* and *Jones* do not require the Government to show that each alleged Hobbs Act violation had a substantial effect on interstate commerce.[3] The proper inquiry remains whether the conduct had a *minimal* effect on commerce. And contrary to Gray's suggestion, it is of no moment to the analysis whether the effect is characterized as "direct" or "indirect"—if the defendant's conduct had a *minimal* effect on commerce, nothing more is required. *See, e.g., Kaplan,* 171 F.3d at 1357 ("Congress intended to protect commerce from any and all forms of effects, whether they are direct or indirect, actual or potential, beneficial or adverse.").

We now apply that standard to the evidence in this case. Gray argues that the Government failed to prove that the conduct underlying his Hobbs Act conviction had a minimal effect on commerce. He therefore contends that the district court should have granted his motion for acquittal. In reviewing challenges to the sufficiency of the evidence in a criminal case, we ask only whether any reasonable factfinder could have found that the evidence established the defendant's guilt beyond a reasonable doubt. *See, e.g., Le* (sustaining Hobbs Act conviction); *Diaz,* 248 F.3d at 1084 (same). The evidence is viewed in the light most favorable to the Government, and all reasonable inferences are drawn, and all credibility choices are made, in the Government's favor. *Id.* (citing *United States v. Lyons,* 53 F.3d 1198, 1200 (11th Cir.1995) and *United States v. Johnson,* 713 F.2d 654, 661 (11th Cir.1983)).

Although perhaps a closer question than the Government maintains, we conclude that, viewing the record in the light most favorable to the verdict, the Government proved a minimal effect on commerce. The robbery deprived the restaurant of cash contained in the money drawer as well as the money drawer itself (which concededly moved in interstate commerce). In addition, the robbery disrupted the restaurant's normal operations during a relatively busy period of the day by forcing the closure of the interior and dining area in the aftermath of the incident. Moreover, the restaurant lost use of the cash register. A reasonable jury could infer that, as a result of these events, the restaurant—which acquired most of its products and equipment from out-of-state companies—had less money available to purchase goods and services from out-of-state suppliers

---

[3]Gray cites no case to the contrary. Indeed, this Circuit in *Le* and *Rodriguez* has already applied the minimal effects test after *Morrison* and *Jones* (albeit without expressly distinguishing those Supreme Court decisions).

and less ability to participate in transactions with out-of-state customers. *See Rodriguez,* 218 F.3d at 1244 ("A mere 'depletion of assets' of a business engaged in interstate commerce will meet the requirement.") (citing *Guerra,* 164 F.3d at 1360).

The facts of this case are analogous to those in *Guerra* and *Paredes,* two other decisions where we upheld Hobbs Act robbery convictions notwithstanding the argument that the Government had not shown a minimal effect on commerce. In *Guerra,* the defendant robbed an Amoco service station, taking some $300 in cash from the service station. The station was also forced to close for more than two hours while police investigated the robbery. We described that case as presenting a classic "depletion of assets" scenario because the robbery deprived the station of cash and potential business and thereby affected interstate commerce. 164 F.3d at 1361. We emphasized that "under our jurisprudence, this is sufficient to satisfy the Hobbs Act's 'minimal effect' jurisdictional requirement." *Id.* (brackets omitted) (citing *Jackson,* 748 F.2d at 1537).

Likewise in *Paredes,* the defendants robbed two local convenience stores of one case of beer, a carton of cigarettes, and no more than $170 in cash. Although the convenience stores were not connected with any out-of-state chain, they both sold products which had been manufactured or produced outside the state. That was enough for us to conclude that the Hobbs Act's jurisdictional requirement had been satisfied. 139 F.3d at 844-45.

Gray's arguments in this case are unavailing. He emphasizes that the Government failed to introduce evidence regarding the exact amount of cash taken from the restaurant. It was uncontroverted, however, that the cash drawer did contain some money. Although it would have been advisable for the Government to have introduced evidence at least approximating the amount of money taken by the defendant, the fact that the exact amount was not established at trial does not, on this record, show that the restaurant's assets were not depleted by Gray's conduct. Gray also suggests that the Government failed to quantify any lost sales or profits actually suffered by the restaurant. There is no requirement that it do so, however, *see Kaplan,* 171 F.3d at 1356 (Hobbs Act does not require adverse effect on commerce), and the evidence in this case—viewed in the light most favorable to the Government—was sufficient for a reasonable jury to infer that the restaurant's assets were indeed depleted by the loss of the cash drawer (including the cash within) and the subsequent partial closure. Again, the Hobbs Act requires nothing more than a *minimal* effect on commerce. Finally, Gray's reliance on *United States v. Frost,* 77 F.3d 1319 (11th Cir.1996), *vacated on other grounds,* 520 U.S. 1226, 117 S.Ct. 1816, 137 L.Ed.2d 1025 (1997), is misplaced. Among other clear

distinctions, *Frost* did not involve a completed robbery of an ongoing business unquestionably participating in interstate commerce;  instead, it involved an attempted extortion scheme aimed at members of a local government council.

We conclude, in short, that the Government introduced sufficient evidence to sustain Gray's Hobbs Act conviction.

IV.

Gray next asserts that the district court erred by upholding the constitutionality of 18 U.S.C. § 3559(c)(3)(A), which places the burden on the defendant to prove by clear and convincing evidence that no dangerous weapon was used in connection with a conviction that, under the statute, would otherwise trigger a mandatory life sentence.  Gray appears to challenge both the provision placing the burden on the defendant and, separately, the provision requiring proof by clear and convincing evidence as opposed to a preponderance of evidence.  The district court essentially found that the Government had met its burden of proving Gray's prior convictions, but that Gray did not meet his burden of proving that the offenses underlying his 1990 robbery conviction did not involve a dangerous weapon (specifically, a screwdriver). Because Gray did not meet that burden, the district court counted the 1990 conviction as a "strike," and imposed the mandatory life sentence called for by § 3559(c)(1).  We find no reversible error.

Under the three strikes statute, 18 U.S.C. § 3559(c)(1), a defendant receives mandatory life imprisonment if he is convicted of a serious violent felony and has previously been convicted of two or more such felonies.  Gray does not deny that his current Hobbs Act conviction, his 1990 robbery conviction, and his 1979 rape conviction are serious violent felonies within the meaning of § 3559(c)(2)(F).[4]  At sentencing, however, Gray did contend that the 1990 robbery conviction came within an exception to the mandatory life sentence rule.  Specifically, the three strikes statute contains a disqualification provision, or an affirmative defense, that provides a defendant with the opportunity to prove that an otherwise qualifying conviction does not constitute a "strike" under the statute.  The disqualification provision states:

(3) Nonqualifying felonies.—

(A) Robbery in certain cases.—Robbery, an attempt, conspiracy, or solicitation to commit

---

[4]The statute defines a "serious violent felony" as "a Federal or State offense, by whatever designation or wherever committed, consisting of ... robbery (as described in section 2111, 2113, or 2118 [of Title 18] )," or "any other offense punishable by a maximum term of imprisonment of 10 years or more ... that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense."  18 U.S.C. § 3559(c)(2)(F).

robbery; or an offense described in paragraph (2)(F)(ii) shall not serve as a basis for sentencing under this subsection *if the defendant establishes by clear and convincing evidence* that—

(i) no firearm or other dangerous weapon was used in the offense and no threat of use of a firearm or other dangerous weapon was involved in the offense; and

(ii) the offense did not result in death or serious bodily injury ... to any person.

18 U.S.C. § 3559(c)(3)(A) (emphasis added). A prior robbery conviction, therefore, does not constitute a strike if the defendant can prove, by clear and convincing evidence, that it is a nonqualifying felony because no dangerous weapon was involved.

Gray failed to persuade the district court that his 1990 robbery conviction was a nonqualifying felony. He does not challenge that particular determination on appeal. Instead, he asserts that § 3559(c)(3)(A) violates his Due Process rights by requiring him to prove a matter (and prove it clearly and convincingly) that the Government should be obliged to prove.

Although they raise issues of first impression in the Eleventh Circuit, Gray's arguments have been rejected by numerous other Circuits. Regarding the shifting of the burden of proof, the Fifth, Sixth, Seventh, Ninth, and Tenth Circuits have all held that this provision in the statute does not violate Due Process. *See United States v. Gatewood,* 230 F.3d 186, 189-90 (6th Cir.2000) (en banc); *United States v. Ferguson,* 211 F.3d 878, 886-87 (5th Cir.), *cert. denied,* 531 U.S. 909, 121 S.Ct. 258, 148 L.Ed.2d 187 (2000), *United States v. Smith,* 208 F.3d 1187, 1190 (10th Cir.2000); *United States v. Kaluna,* 192 F.3d 1188, 1196 (9th Cir.1999) (en banc), *cert. denied,* 529 U.S. 1056, 120 S.Ct. 1561, 146 L.Ed.2d 465 (2000); *United States v. Wicks,* 132 F.3d 383, 388-89 (7th Cir.1997). We agree with those decisions.

As those cases explain, § 3559(c)(3)(A)—which by its terms carves out a narrow exception to the broad rule that all robberies are "serious violent felonies" for purposes of § 3559(c)(1)—creates an affirmative defense to a sentencing enhancement. Congress is entitled to shift the burden of proof to the defendant for an affirmative defense. In *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), for example, the Supreme Court upheld a New York statute that placed on the defendant the burden of proving the affirmative defense of acting under the influence of extreme emotional distress in order to reduce a crime to manslaughter in the first degree. The Court held that if a state chooses to recognize a factor that mitigates the degree of criminality or punishment, as long as the prosecution has proven all the elements of the crime beyond a reasonable doubt, the state is free to allocate to the defendant the burden of proving the affirmative defense. *See id.* at 209-10, 97 S.Ct. at 2326-27. Similarly, in *Parke v. Raley,* 506 U.S. 20, 113 S.Ct. 517, 121

L.Ed.2d 391 (1992), the Supreme Court held that Kentucky's persistent felony offender sentencing statute, which included a burden-shifting rule similar to § 3559(c)(3)(A), "easily passes constitutional muster." *Id.* at 28, 113 S.Ct. at 522. Kentucky's law provided mandatory minimum sentences for repeat felons; under the statute, defendants could challenge their prior convictions, but bore the burden of demonstrating that those convictions were invalid. The Court held that "even when a collateral attack on a final conviction rests on constitutional grounds, the presumption of regularity that attaches to final judgments makes it appropriate to assign a proof burden to the defendant." *Id.* at 31, 113 S.Ct. at 524.

Put simply, a defendant's "ability to refute the use of a prior conviction as a strike under the statute exists only because Congress chose to include the disqualification provision as part of the three strikes statute." *See Gatewood,* 230 F.3d at 191. When enacting a statute, especially a sentencing enhancement, Congress need not provide an affirmative defense to a criminal defendant. Congress could have enacted the three strikes statute independent of the disqualification provision, including only the statutory language defining all robberies as serious violent felonies. *See* 18 U.S.C. § 3559(c)(2)(F)(i). "If Congress can choose whether or not to provide a defense, it follows that the burden of proof Congress places on such a defense cannot be unconstitutional." *Gatewood,* 230 F.3d at 191; *see also Wicks,* 132 F.3d at 389. We hold that § 3559(c)(3)(A) is not unconstitutional insofar as it shifts the burden of proof to the defendant to show that a prior robbery conviction that ordinarily would trigger a mandatory life sentence under § 3559(c)(1) comes within the narrow exception for nonqualifying felonies.[5]

As for the clear-and-convincing standard, the only Circuits to address the question squarely have concluded that this provision does not violate Due Process. *See Gatewood,* 230 F.3d at 190-91 (distinguishing *Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)); *Ferguson,* 211 F.3d at 887. Other courts have found it unnecessary to resolve the issue because they concluded that the

---

[5]In his reply brief, Gray appears to argue that the Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) requires a different result. *Apprendi* holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. at 2362-63. Nothing in *Apprendi* concerns the proper allocation of the burden of proof for an affirmative defense to a federal sentencing enhancement statute. *Cf. Almendarez-Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (rejecting argument that, because the fact of recidivism increased the maximum penalty to which a defendant was exposed, Congress was constitutionally required to treat recidivism as an element of the crime that must be charged in the indictment and proven beyond a reasonable doubt); *cf. also Jones v. United States,* 526 U.S. 227, 248, 119 S.Ct. 1215, 1226-27, 143 L.Ed.2d 311 (1999) (explaining that *Almendarez-Torres* "stands for the proposition that not every fact expanding a penalty range must be stated in a felony indictment, the precise holding being that recidivism increasing the maximum penalty need not be so charged.").

defendant failed to meet even a preponderance standard. *See, e.g., Smith,* 208 F.3d at 1190 (explaining that "[u]nder any standard of proof, defendant cannot establish that he is exempt from the three strikes enhancement"); *Kaluna,* 192 F.3d at 1196 (same). We follow the lead of these cases, because on this record Gray would not have been entitled to avoid the statutory enhancement even if the burden were merely preponderance of the evidence. *See Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482 (1905) (courts are not "to decide questions of a constitutional nature unless absolutely necessary to a decision of the case").

At his plea colloquy on the 1989 robbery charges, Gray (who was represented by counsel) acknowledged under oath that the prosecutor's statement of the facts of those incidents—which referred to Gray's use of a screwdriver—was true. In addition, there was testimony in this case by the arresting officer recounting statements by the victims of the 1989 incidents referring to Gray's use of a screwdriver. Although Gray contends that he "impeached" the officer by revealing that the officer (through his insurer) settled an excessive force lawsuit brought against him by Gray, that evidence has little impeachment value, and does not at all undermine Gray's own admissions during the plea colloquy. Gray argues that a screwdriver was not mentioned in the actual plea agreement, but this claim is of little consequence given his admissions. Gray further asserts that the alleged screwdriver was never found; the arresting officer, however, testified that Gray fled the scene of the second robbery, ran into thick bushes, and was apprehended only after a fight with the police. It is reasonable to infer that the screwdriver was either lost or was deliberately concealed during Gray's flight. On this record, and under any standard of proof, Gray was not entitled to the § 3559(c)(1)(A) defense to the mandatory life sentence triggered by his two prior serious felony convictions. We therefore decline to set aside Gray's sentence on that basis.

V.

Gray's next argument relates to his sentence on Count II, for carrying and using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). The district court applied the mandatory seven-year minimum set forth in § 924(c)(1)(A)(ii) after finding that Gray "brandished" a firearm during the robbery giving rise to this case. Gray contends that his sentence is unlawful because the issue of whether he brandished a firearm is not a sentencing factor, but rather is an element of the offense that must be charged in the indictment and proved to the jury.[6] We are unpersuaded.

---

[6]Gray does not challenge the district court's finding that he did brandish a firearm during the robbery.

Section 924(c)(1)(A) provides:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence ... uses or carries a firearm ... shall, in addition to the punishment provided for such crime of violence ...
>
> > (i) be sentenced to a term of imprisonment of not less than 5 years;
> >
> > (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
> >
> > (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

18 U.S.C. § 924(c)(1)(A).

In *United States v. Pounds,* 230 F.3d 1317 (11th Cir.2001) (per curiam), *cert. denied,* --- U.S. ----, 121 S.Ct. 1631, 149 L.Ed.2d 492 (2001), we considered an argument almost identical to the one advanced now by Gray. In that case, the defendant (Pounds) was convicted of robbery, in violation of the Hobbs Act, and for using a firearm during a crime of violence, in violation of § 924(c), as a result of his robbery of an Atlanta fast food restaurant. On the second count, the district court sentenced Pounds in accordance with 18 U.S.C. § 924(c)(1)(A)(iii), which mandates a sentence of not less than ten years if a firearm was discharged during the underlying offense. The district court concluded over Pounds's objection that the discharge of a firearm is treated by § 924(c)(1)(A) as a sentence enhancement factor rather than as an element of the offense, and that it was required to sentence Pounds to ten years' minimum under that provision even though the fact of the discharge of the firearm was neither included in the indictment nor submitted to the jury. On appeal, Pounds argued that, under § 924(c)(1)(A)(iii), discharging a firearm is a separate element of the offense that calls for a jury determination and must be included in the indictment. We ruled otherwise.

> [T]he language and structure of § 924(c)(1)(A) demonstrate that Congress intended the fact of the discharge of a firearm during a crime of violence to be a sentencing factor and not an element of the § 924(c)(1)(A) offense. "The first clause of § 924(c)(1)(A), standing alone, defines the offense of using or carrying a firearm during a crime of violence while subsections (i), (ii) and (iii) do 'no more than single out subsets of those persons [who carry or use firearms during crimes of violence] for more severe punishment....' " *United States v. Carlson,* 217 F.3d 986, 987 (8th Cir.2000) (concluding that the language, structure, and legislative history behind § 924(c)(1)(A) indicate Congress' intent that brandishing a firearm under § 924(c)(1)(A)(ii) be considered a sentencing factor rather than an element of the offense) (citations omitted) [*cert. denied,* --- U.S. ----, 121 S.Ct. 822, 148 L.Ed.2d 706 (2001) ]. Accordingly, we hold that § 924(c)(1)(A) defines a single criminal offense for using or carrying a firearm during a crime of violence, while subsection (iii) describes the sentencing implications if a firearm is discharged during the commission of the crime. *Id.* at 989.

> This result is unchanged by the Supreme Court's recent decision in [*Apprendi* ]. *Apprendi* held that any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum, must be submitted to a jury and proved beyond a reasonable doubt. Nevertheless, *Apprendi* is inapplicable under the present facts because every conviction under §

924(c)(1)(A) carries with it a statutory maximum sentence of life imprisonment, regardless of what subsection the defendant is sentenced under. The discharge of a firearm does not increase the maximum possible penalty of life under § 924(c)(1)(A); rather, it increases only the mandatory minimum penalty. *See Carlson,* 217 F.3d at 989 (stating that the Supreme Court has indicated that statutes which provide for increased mandatory minimum penalties based on the presence of certain facts define one crime with sentencing enhancements, rather than multiple distinct offenses) (citing *McMillan v. Pennsylvania,* 477 U.S. 79, 87-88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986)).

Because the discharge of a weapon under § 924(c)(1)(A)(iii) is a sentencing factor rather than an element of the offense and because § 924(c)(1)(A)(iii) does not increase the maximum statutory penalty for "using and carrying" a firearm in relation to a crime of violence, we conclude that the sentence imposed on Pounds by the district court is correct.

230 F.3d at 1319-20 (citations and footnote omitted).

Although *Pounds* 's holding technically addresses only § 924(c)(1)(A)(iii)—the "discharged" clause—its language and logic foreclose any argument that § 924(c)(1)(A)(ii)—the "brandished" provision—may be treated differently. As *Pounds* explains, subsection (ii), like subsection (iii) does not define a separate offense, but rather "do[es] no more than single out subsets of those persons who carry or use firearms during crimes of violence for more severe punishment." 230 F.3d at 1319 (quoting *Carlson,* 217 F.3d at 987) (internal quotation marks and brackets omitted). Other courts considering this issue have agreed that § 924(c)(1)(A)(ii) is a sentencing factor and therefore whether the defendant "brandished" a firearm is not an allegation that must be charged in the indictment and proved to a jury. *See United States v. Barton,* No. 00-10233, --- F.3d ---- (5th Cir. July 9, 2001) (concluding that "subsections (i), (ii), and (iii) set forth sentencing factors, not separate elements of different offenses"); *United States v. Harris,* 243 F.3d 806, 812 (4th Cir.2001) ("we hold that the 'brandished' clause of 18 U.S.C. § 924(c)(1)(A)(ii) sets forth a sentencing factor that need not be charged in the indictment"); *Carlson,* 217 F.3d at 989 (8th Cir.) (same).[7] Accordingly, the district court did not err by finding on the § 924(c) count that Gray was subject to the seven-year minimum under § 924(c)(1)(A)(ii).

---

[7]Gray relies heavily on *Castillo v. United States,* 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000). In that case, the Court found that a provision in an earlier version of § 924(c), which increased the minimum penalty based on the type of firearm involved in the underlying crime, was an element of the § 924(c) offense rather than merely a sentencing factor. *Castillo,* however, pre-dated this Court's opinion in *Pounds.* And while *Pounds* does not expressly discuss *Castillo,* other courts addressing Gray's position have fully analyzed the Supreme Court's opinion, and have concluded that *Castillo* is readily distinguishable. *See, e.g., Barton; Harris,* 243 F.3d at 809-11. We agree that *Castillo* does not require us to treat the "brandished" clause in the current § 924(c)(1)(A)(ii) as an offense element. Notably, *Castillo* recognized that courts have traditionally viewed certain items as sentencing factors, such as the manner in which a basic crime was carried out, "e.g., that the defendant ... brandished a gun." 530 U.S. at 126, 120 S.Ct. at 2094. Gray's other arguments for treating § 924(c)(1)(A)(ii) as an offense element, including his invocation of the rule of lenity and the doctrine of constitutional doubt, are likewise unconvincing.

## VI.

Finally, we address Gray's argument that the indictment was defective. He contends that the indictment failed to allege any criminal intent and therefore did not include an essential element of Hobbs Act robbery. Gray did not raise this argument before the district court; indeed, he did not raise it on appeal until, after the close of normal briefing, he moved for leave to raise it in a supplemental brief (which we permitted). Significantly, Gray does *not* argue that the Government failed to prove an essential element of Hobbs Act robbery, or that the district court failed to instruct the jury properly regarding those elements. He contends only that the indictment was insufficient and that his conviction must be set aside on that basis alone.

Because Gray did not assert this objection below, our review of the issue is very limited. "When the adequacy of an indictment is challenged for the first time on appeal, this Court 'must find the indictment sufficient unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted.' " *United States v. Adams,* 83 F.3d 1371, 1375 (11th Cir.1996) (quoting *United States v. Hooshmand,* 931 F.2d 725, 734-35 (11th Cir.1991)). Gray himself concedes that our review is limited. Appellant's Supp. Br. at 4-5.

In *Adams,* we found no reversible error in similar circumstances. The defendant in that case was indicted for violating the federal kidnaping statute. For the first time on appeal, he argued that the indictment was defective because it did not allege the requisite mens rea (either a specific purpose to secure a "ransom or reward," or willfulness), which was an essential element of the offense. We observed that "[t]he only arguable deficiency in the indictment is a failure to explicitly charge willfulness." 83 F.3d at 1375. We ultimately concluded, however, that the defendant was not entitled to relief, because the indictment gave the defendant adequate notice of the charges against him and the defendant did not show any actual prejudice. We stressed that " '[p]ractical, rather than technical, considerations govern the validity of an indictment. Minor deficiencies that do not prejudice the defendant will not prompt this court to reverse a conviction.' " *Id.* (quoting *Hooshmand,* 931 F.2d at 735). We then emphasized that the indictment alleged the relevant facts with adequate specificity and also referred expressly to the statute under which the defendant had been charged.

The indictment in this case easily meets that lenient standard. Although it did not expressly allege mens rea, the indictment contained enough factual detail to apprise Gray of the conduct for which he would

be tried. Moreover, the indictment specifically referred to the Hobbs Act, 18 U.S.C. § 1951. Taken together, these allegations gave Gray sufficient notice of the charges against him, and under *Adams* he is not entitled to relief at this late stage.

Moreover, our precedent suggests—and Gray does not squarely contest—that the only mens rea required for a Hobbs Act robbery conviction is that the offense be committed knowingly. *See United States v. Thomas,* 8 F.3d 1552, 1562 (11th Cir.1993) (finding no plain error in jury instruction that did not require proof of specific intent for Hobbs Act robbery, and explaining that "[t]he Hobbs Act definition of robbery does not seem to require a finding of specific intent whereas at common law robbery required such a finding"). The Hobbs Act allegations in Count I of this indictment—that Gray "unlawfully" interfered with commerce by taking property "against [the victims'] will" and "by means of ... force, violence, and fear of injury"—necessarily impart an allegation of knowledge. At least in this context, an indictment is not defective simply because it fails to allege mens rea so long as the allegation that the crime was committed with the requisite state of mind may be inferred from other allegations in the indictment. *See, e.g., United States v. Oakie,* 12 F.3d 1436, 1440 (8th Cir.1993) (citing *United States v. Gutierrez,* 978 F.2d 1463, 1466-67 (7th Cir.1992)).

Gray's argument is premised on a Ninth Circuit decision, *United States v. Du Bo,* 186 F.3d 1177 (9th Cir.1999), where the court reversed a Hobbs Act extortion conviction because the indictment did not allege mens rea.[8] The Ninth Circuit reasoned that mens rea is an essential element of the Hobbs Act, and that the absence of any allegation regarding that element was fatal to the indictment regardless of whether the defendant actually suffered any prejudice. *Id.* at 1180-81. In an important caveat, however, the court indicated that its holding would be "limited to cases where a defendant's challenge is timely.... Untimely challenges to the sufficiency of an indictment are reviewed under a more liberal [harmless error] standard." *Id.* at 1180 n. 3.[9] *Du Bo,* therefore, does not help Gray.

---

[8]*Du Bo* was decided several months before Gray's trial, and thus does not excuse his failure to raise this objection earlier.

[9]In a pair of unpublished opinions, the Ninth Circuit has emphasized this distinction. *See United States v. Greene,* No. 99-10192, 230 F.3d 1368 (9th Cir. Sept.5, 2000) (no reversible error under *Du Bo* because objection was not raised below and "the combination of the statutory citation and the facts as set forth in the indictment provided a sufficient basis for [the defendant] to appraise himself of the charged offense" (citations omitted)), *cert. denied,* --- U.S. ----, 121 S.Ct. 838, 148 L.Ed.2d 719 (2001); *United States v. Woodruff,* No. 98-10358 (9th Cir. Sept.29, 1999) (no reversible error under *Du Bo* because objection was not raised below and there was no showing of prejudice), *cert. denied,* 530 U.S. 1206, 120 S.Ct. 2202, 147 L.Ed.2d 237 (2000); *see also United States v. Mojica-Baez,* 229 F.3d 292, 309-12 (1st

For the foregoing reasons, we will not set aside Gray's conviction on the ground that the indictment failed to expressly allege mens rea. As Gray has presented no other grounds for reversal, we affirm the conviction and sentence.

AFFIRMED.

---

Cir.2000) (recognizing limitation on *Du Bo* and applying harmless error analysis in this situation).